NUMBER 13-06-549-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


SHIRLEY J. NEELEY,

COMMISSIONER OF EDUCATION, 
 Appellant,


v.
 


TEXAS STATE TEACHERS ASSOCIATION

AND MARIA GUADALUPE RAMOS, Appellees.

 


On appeal from the 200th District Court of Travis County, Texas.


 


 

MEMORANDUM OPINION



 Before Justices Garza, Benavides, and Vela


Memorandum Opinion by Justice Benavides



 Appellees are the Texas State Teachers Association, a professional association of
Texas public school teachers, and Maria Guadalupe Ramos, one of its members
(collectively "TSTA"). TSTA brought suit against Shirley Neeley, the Commissioner of
Education (the "Commissioner"), seeking declaratory and injunctive relief relating to
directives issued in 2005 and 2006 to all Texas school districts, requiring teachers to be
trained and to undergo testing to administer a standardized test to their students. In this
interlocutory appeal, the Commissioner challenges the trial court's denial of her plea to the
jurisdiction. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (Vernon Supp. 2006). We
hold that TSTA does not have standing to sue the Commissioner and that its claims for
declaratory and injunctive relief are not ripe for review; accordingly, we vacate the trial
court's judgment and dismiss the case for lack of jurisdiction. Tex. R. App. P. 43.2(e). 

I. Background 

 Title III of the No Child Left Behind Act of 2001 (the "Act") was enacted to ensure
that Limited English Proficient ("LEP") children "attain English proficiency, develop high
levels of academic attainment in English, and meet the same challenging State academic
content and student academic achievement standards as all children are expected to
meet." 20 U.S.C.A. § 6812(1) (West 2003). In order to meet this goal, Congress offered
grant money to state educational agencies in return for compliance with the Act. Id. §
6821. 

 The Texas Education Agency submitted an education plan to the Secretary of
Education and obtained grant money under the Act, and it allocated ninety-five percent of
that money to local school districts within the state of Texas. Id. Each school district is
obligated by federal law to use the appropriated money for the purposes outlined in the
Act. Id. § 6825. The Act requires states to ensure and demonstrate to the U.S.
Department of Education that the manner in which they measure LEP students' progress
is valid and reliable. Id. § 6823(b)(2). 

 To comply with the Act's requirements, the Commissioner developed a standardized
test administered to LEP students called the Texas English Language Proficiency
Assessment System ("TELPAS"). The TELPAS test covers several areas of English
instruction. The "Texas Observation Protocol" or "TOP" portion of the test assesses LEP
students' written language acquisition through written samples. 

 During the 2003-2004 school year, the Texas Education Agency began requiring
that school districts select and train teachers to administer the TOP. On November 2,
2005, the Commissioner issued a directive regarding the TOP training program for the
2005-2006 school year (the "2005-2006 Directive"), which is the subject of TSTA's lawsuit. 
As in prior years, the 2005-2006 Directive required teacher training, which was to occur
during the fall of 2005. 

 Although teachers frequently must attend training to administer standardized tests,
the 2005-2006 Directive required more than just training. After the training, the teachers
were required to take a test. The alleged purpose of this test was to ensure that all
teachers rating LEP students' writing samples rated the papers in a consistent manner, as
required by Title III of the Federal No Child Left Behind Act, 20 U.S.C. § 6823. 

 Under the 2005-2006 Directive, if a teacher passed the test, that teacher became
a certified rater of LEP students' writing samples (sometimes referred to as a "TOP
certified rater"). If a teacher failed the test, however, the teacher was required to attend
additional training in the spring and take another test. Failure to pass the second test
meant that the teacher could rate his or her students' papers, but those ratings had to be
reviewed by a second rater who was TOP certified. If the TOP certified rater scored the
LEP student's writing sample differently than the non-certified rater, the certified rater's
grade controlled. The 2005-2006 Directive did not provide for any disciplinary or monetary
sanctions for a teacher's failure to pass the test.

 On January 6, 2006, TSTA filed the underlying lawsuit in Travis County District
Court. TSTA challenged the 2005-2006 Directive, seeking declaratory judgment and
injunctive relief. Specifically, TSTA asked the trial court to declare the 2005-2006 Directive
a void, ultra vires act and to enjoin its enforcement. TSTA argued that there was no statute
granting the Commissioner authority to test teachers and to create additional requirements
for teaching. Instead, TSTA argued that only the State Board for Educator Certification
had authority to create credentialing requirements for teachers. In the alternative, TSTA
argued that if the Commissioner had the power to make such a rule, she failed to comply
with the Administrative Procedure Act's requirements for adopting administrative rules by
issuing the 2005-2006 Directive without first publishing it in the Texas Register and
providing for a comment period. See Tex. Gov't Code Ann. §§ 2001.021-.041 (Vernon
2000 & Supp. 2006). Finally, TSTA asserted that the 2005-2006 Directive deprived
TSTA's members of due process, and it requested a declaration to that effect. 

 TSTA argued that its members suffered harm from the 2005-2006 Directive in three
ways: (1) teachers may be subject to sanctions by the school districts if they failed to
become a TOP certified rater; (2) teachers were forced to attend additional training without
compensation from the school districts; and (3) teachers' certificates were devalued
because teachers were no longer able to give final ratings on their LEP students' writing
samples. 

 On January 31, 2006, while the spring test was in progress, the Travis County
District Court held a hearing on TSTA's application for a temporary injunction. At this
hearing, for the first time, TSTA asserted a "stigma" injury. Counsel for TSTA argued that
"if a teacher happens to fail this test in the spring, there will be a record kept of this by the
employee's school district and the TEA. A teacher should not have to suffer the humiliation
of failing a test that has no legal basis to begin with." 

 TSTA offered testimony of several witnesses at the hearing. First, Cynthia
Kennedy, who is a teacher with the East Central Independent School District in San
Antonio, testified that her employer required her to be trained as a TOP certified rater. 
However, she failed the fall 2005 TOP rater test. Kennedy testified that she had been
required to attend additional training in the spring. She further testified that if she failed the
spring test, her teaching certificate would be devalued because she would not be the final
rater on her students' writing samples. She testified that her inability to be the final rater
on her students' papers would demean her professional reputation. 

 On cross-examination, however, Kennedy admitted that the school district had not
threatened to terminate her contract if she failed the spring testing. She admitted that her
contract with the school district did not require TOP rater certification. Kennedy also
testified that despite having failed the fall test, she was still teaching the same classes and
drawing the same salary. Finally, she did not testify that the school districts or the
Commissioner published the results of the fall test or would publish the results of the spring
test to the general public. Other than indicating that her inability to be the final rater of her
students' papers would harm her reputation, she did not identify any source of stigma.

 Second, Maria Guadalupe Ramos testified that she was a teacher and had failed
the fall 2005 test. She testified that she was aware of several other teachers on her
campus that had failed, although she did not specify how she obtained that knowledge.
Ramos stated that she had to stay after hours to train for the test and that she was not
compensated for this additional time. On cross-examination, however, she admitted that
she would continue to grade LEP students' writing samples even if she failed the spring
test. The only change in her employment imposed by the 2005-2006 Directive was that
a second rater would have to review her work. The trial court also questioned Ramos, who
admitted that her school district was not requiring TOP rater certification as part of her
employment and that the school district had not threatened any sanction for failure to
become a TOP certified rater. 

 Third, Kevin O'Hanlon, TSTA's education law expert, testified that he was familiar
with the different employment contracts used by school districts throughout the state. He
read a standard contract provision into the record: 

 This contract is conditioned on an employee's satisfactorily providing the
certification, service records, teaching credentials and other records required
by law, the Texas Education Agency, State Board for Educator Certification,
State Board of Education or the district.


With regard to this provision, he testified, "It's at least conceivable that a district could seek
non-renewal [of a teacher's contract] based solely upon a teacher not becoming a certified
rater." 

 He then clarified that a school district may elect to nonrenew a term contract
pursuant to its employment policies, and it must give notice at least 45 days prior to the last
day of instruction in the school year. See Tex. Educ. Code Ann. § § 21.203(b); 21.206(a)
(Vernon 2006). In other words, before a school district can rely on a teacher's failure to
become a certified rater as a ground for nonrenewal, the school district must adopt a policy
stating as much at least 45 days before the last day of school for that year, and it must
then provide the teacher with 45 days notice. Id. 


 After this discussion, O'Hanlon admitted that because the TOP rater certification is
a new requirement, he was unaware of any school district that had taken steps to include
TOP rater certification as a requirement for contract renewal. He further stated that he was
not aware of any existing contract that specifically required a teacher to be a TOP rater. 

 Finally, Laura Ayala testified as the Commissioner's representative. When asked
whether the Commissioner or Texas Education Agency would enforce the requirement that
non-certified raters' work be reviewed by a certified rater, she testified that she was not
sure that the agency would even have the information required to impose a sanction. 

 At the end of the hearing, the Commissioner agreed to modify the 2005-2006
Directive so that teachers who failed the spring test would be allowed to rate papers
without having a second, TOP certified rater review their work. On February 1, 2006, in
accordance with her agreement with TSTA, the Commissioner sent a letter to all Texas
school districts with the following modification to the TOP training:

 This letter is to notify districts of a change in the administration procedures
of the Texas Observation Protocols (TOP). Individuals whom districts assign
as raters and who have taken the qualifying component twice but still do not
meet the online qualifying requirements will not be required to have a
second, certified rater of writing provide an additional rating for spring 2006. 


 . . . .


 It is, however, recommended that districts implement local procedures to
ensure the validity and reliability of the rating process. As in past years, this
can be accomplished through appropriate collaboration and rating verification
processes.


Thus, for the 2005-2006 school year, teachers who failed the test to become certified
raters of LEP writing samples were not prohibited from rating the LEP writing samples, and 
a second, certified rater was not required to re-grade the writing samples. 


 On April 4, 2006, the Commissioner notified the school districts of the TOP rater
training for the 2006-2007 school year (the "2006-2007 Directive"). Under the 2006-2007
Directive, raters were separated into three categories. First, raters certified during the
2005-2006 school year would not have to be retested-rather, they would attend a refresher
training course before grading LEP students' writings in the spring of 2007. Second,
teachers who were trained in 2005-2006 but did not become TOP certified raters were
required to complete an online refresher course lasting approximately three to four hours
in December 2006 or January 2007. These individuals would be retested to become TOP
certified raters between January 29, 2007 and March 2, 2007. Finally, individuals who had
neither been trained nor tested during 2005-2006 would complete training and testing in
the fall of 2006. If these teachers did not pass the fall qualifying test, they would be
required to attend additional training and take another test in the spring, as required during
the 2005-2006 school year. 

 In contrast to the 2005-2006 Directive, and presumably in accordance with the
partial settlement between the parties, the new 2006-2007 Directive made no mention of
whether a certified rater would need to review grades given by non-certified raters. In fact,
it mentions no consequence for a teacher who fails to become a certified rater after the
spring 2007 testing is completed.

 On July 19, 2006, after the 2006-2007 Directive was issued but before it was
implemented, the Commissioner filed a plea to the jurisdiction. She argued that the trial
court lacked subject-matter jurisdiction because TSTA lacked standing, and the claims
alleged were not ripe. Essentially, the Commissioner complained that TSTA had not
identified any immediate or direct harm to any of its members resulting from the Directives
because (1) the Directives themselves contained no consequence for a teacher who failed
to become certified, and (2) the school districts had not threatened any sanction. 
Additionally, any harm identified would necessarily flow from and be caused by the school
districts, not the Commissioner. (1) 

 TSTA amended its pleadings in response to the plea to include its complaints
regarding the 2006-2007 Directive. Even though the 2005-2006 Directive had been fully
implemented, TSTA did not plead that any teacher had been terminated or threatened with
any sanction by a school district for failing to become a certified rater under the 2005-2006
Directive. (2) 

 TSTA also filed a response to the Commissioner's plea. TSTA asserted the same
injuries alleged in its original and amended petition, but it also added a new injury not
contained in its pleadings. TSTA alleged that teachers who had failed to become TOP
rater certified after the spring 2006 test were "stigmatized." It did not specify how or why
these teachers were "stigmatized." 

 The trial court then held a hearing on the Commissioner's plea to the jurisdiction. 
The Commissioner offered the transcript of the temporary injunction hearing into evidence. 
TSTA did not offer any additional testimony. The trial court, considering all the pleadings
and evidence, denied the Commissioner's plea to the jurisdiction. This interlocutory appeal
ensued. (3) Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8).

 II. Standard of Review

 "Whether a trial court has subject matter jurisdiction is a question of law." See Tex.
Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004); Tex. Nat'l Res.
Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002). When a plea to the
jurisdiction challenges the plaintiff's pleadings, we must look at those pleadings to
determine if the plaintiff has alleged facts that demonstrate the court's jurisdiction. 
Miranda, 133 S.W.3d at 226. "If the pleadings do not contain sufficient facts to
affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate
incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs
should be afforded the opportunity to amend. If the pleadings affirmatively negate the
existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the
plaintiffs an opportunity to amend." Id.

 In contrast, if the plea to the jurisdiction challenges the evidence supporting
jurisdictional facts, both the trial court and this Court must consider relevant evidence
submitted by the parties to resolve the jurisdictional dispute. Id. at 227. The defendant
must initially put on some evidence demonstrating that the court lacks subject-matter
jurisdiction. Id. at 228; see also City of La Joya v. Ortiz, No. 13-06-401, 2007 Tex. App.
LEXIS 818, at *5 (Tex. App.-Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) ("The
defendant cannot simply deny the existence of jurisdictional facts and force the plaintiff to
raise a fact issue."). The burden then shifts to the plaintiff, who must merely raise a
disputed material fact regarding jurisdiction. Miranda, 133 S.W.3d at 228. We take as true
all evidence favorable to the non-movant. Id. We will also indulge every reasonable
inference and resolve any doubts in the nonmovant's favor. Id. 

III. General Principles of Subject-Matter Jurisdiction

 The Commissioner's arguments in favor of her plea to the jurisdiction implicate the
standing and ripeness doctrines, which are part and parcel of a court's inquiry into subject-matter jurisdiction. Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 851 (Tex. 2000);
Patterson v. Planned Parenthood of Houston & Southeast Tex., Inc., 971 S.W.2d 439, 442
(Tex. 1998); Tex. Assoc. of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443 (Tex. 1993). 
Both doctrines "emphasize the need for a concrete injury for a justiciable claim to be
presented." Patterson, 971 S.W.2d at 442. These doctrines prohibit courts from issuing
advisory opinions that will not resolve an actual dispute. Id. The difference between
standing and ripeness is in the focus of the doctrines' inquiries-while standing focuses on
who may bring a claim, ripeness determines when the claim may be brought. Id. 

IV. Standing

 "A challenge to standing implicates the boundaries of constitutionally legitimate
judicial action and, if successful, ultimately compels dismissal for lack of jurisdiction." 
DaimlerChrysler Corp. v. Inman, 121 S.W.3d 862, 867 (Tex. App.-Corpus Christi 2003,
pet. granted). In Texas, the standing requirement arises from the open courts provision
and the separation of powers clause of the Texas Constitution. Tex. Assoc. of Bus., 852
S.W.2d at 443; Inman, 121 S.W.3d at 869. The open courts provision directly requires that
a plaintiff bringing suit have suffered an injury, while the separation of powers clause
prohibits Texas courts from issuing advisory opinions. Inman, 121 S.W.3d at 867. 

 An association has standing to sue if (1) its members would otherwise have
standing to sue, (2) the interests it seeks to protect are germane to the organization's
purpose, and (3) neither the claim asserted nor the relief requested requires the individual
members to participate in the lawsuit. Tex. Assoc. of Bus., 852 S.W.2d at 447. Initially,
an association bringing suit on behalf of its members must first establish that its members
satisfy the general test for individual standing. Id. In general, individual standing consists
of three elements: (1) a distinct injury to the plaintiff, (2) caused by the defendant's
actions, and (3) which can be redressed by the relief sought. Brown v. Todd, 53 S.W.3d
294, 305 (Tex. 2001); Inman, 121 S.W.3d at 872; Met-Rx USA, Inc. v. Shipman, 62 S.W.3d
807, 810 (Tex. App.-Waco 2001, pet. denied). (4) 

 The general test's second requirement, "causation," means that the "[t]he injury
must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely'
to follow from a favorable decision." Allen v. Wright, 468 U.S. 737, 751 (1984); Inman, 121
S.W.3d at 875, 880. In other words, our Court must look at the source of the alleged injury
to determine standing. Inman, 121 S.W.3d at 880; Met-Rx USA, Inc., 62 S.W.3d at 811. 

 Because of the dearth of Texas authority on the causation requirement, we look to
Federal standing jurisprudence for guidance in our standing inquiry. Inman, 121 S.W.3d
at 868. In Alan v. Wright, the plaintiffs were the parents of African-American students in
racially desegregating school districts. Wright, 468 U.S. at 758. They alleged that the IRS
was too lenient in granting tax exempt status to private schools with racially discriminatory
policies. Id. The plaintiffs alleged that their children's ability to receive a desegregated
education was harmed by private schools' ability to obtain tax exempt donations, which
encouraged parents of white children to place their children in these discriminatory private
schools rather than in desegregating public schools. Id. 

 The Supreme Court held that there was no evidence that the alleged injury was
"fairly traceable" to unlawful IRS grants of tax exemptions. Id. The Court stated that it was
speculative whether "any given parent of a child attending such a private school would
decide to transfer the child to public school as a result of any changes in educational or
financial policy made by the private school once it was threatened with the loss of tax-exempt status." Id. Because the injury was dependent upon the decisions of third parties,
and whether these decisions would be made was pure speculation, the Court held that the
chain of causation was too attenuated to find standing. Id. In other words, because the
injury "results from the independent action of some third party not before the court,"
standing was not established. Id. 


 On appeal, TSTA urges three types of injury allegedly resulting from the Directives:
(1) teachers could be subject to sanctions by the school districts if they fail to pass the TOP
examination and become a certified rater; (2) teachers were forced to attend additional
training after regular work hours without compensation; and (3) teachers' teaching
certificates are devalued, and they will be stigmatized. We believe that TSTA does not
have standing to assert these claims because the alleged injuries are not "fairly traceable"
to the Commissioner. 

A. Possibility of Sanctions by School Districts

 As in Allan v. Wright, TSTA does not have standing to assert a claim against the
Commissioner for alleged possible sanctions imposed by the school districts. Id. The
Directives challenged do not require any sanction for failing to become a certified rater. 
In fact, TSTA's pleadings negate any possibility of standing. TSTA expressly pleaded that
"the employing school districts may seek sanctions" against the teachers. According to
TSTA's pleadings, any sanction would necessarily be imposed by the school districts, not
the Commissioner. Therefore, we hold that the alleged possibility of sanctions by the
school district is not fairly traceable to the Commissioner and is insufficient to demonstrate
standing. Id. 

B. Additional Training Without Compensation

 TSTA argues that teachers have been required to endure training outside of regular
work hours without compensation from the school districts under the Directives. TSTA's
pleadings again affirmatively negate jurisdiction. Our analysis is also supported by the
evidence produced by the Commissioner but elicited by TSTA at the temporary injunction
hearing. Miranda, 133 S.W.3d at 226. Taking this evidence in TSTA's favor, TSTA lacks
standing.

 First, TSTA has essentially admitted that the lack of compensation flows from a
decision by the school districts. TSTA alleged in its second amended petition that

 Texas public school districts must employ classroom teachers and other
professional certified employees under written contracts of employment. . . .
Many of these employing school districts will not compensate their affected
teachers who are forced to receive this additional training.


TSTA's pleading does not allege how the Commissioner is involved in the districts'
compensation decisions. Rather, TSTA's pleading affirmatively negates jurisdiction by
conceding that compensation is a matter of contract between the teachers and their
employers.

 Second, there is no evidence that the Commissioner has required the teachers'
attendance at training sessions without compensation. The Directives do not mention
compensation. There was no evidence presented showing how the Commissioner
participates in compensation decisions. The Commissioner argued at the temporary
injunction hearing that the teachers' employment was governed by contracts between the
district and the teachers. Kennedy testified that she was subject to a one-year contract
with her employer. Although Ramos testified that she was not compensated for her
additional training time, she did not indicate how this was the Commissioner's fault. 
Additionally, TSTA's expert was called to testify about the terms of these contracts. Thus,
it was essentially undisputed at the temporary injunction hearing that teachers' salaries are
governed by individual contracts with the school districts. 


 Finally, the Education Code supports the conclusion that the Commissioner is not
involved in compensation decisions. The Texas Education Code sets the minimum
number of service days that a teacher must provide to a school district, and it also sets the
minimum salary requirements for teachers. Tex. Educ. Code Ann. § § 21.401-.402
(Vernon 2006). However, a teacher's salary is often supplemented with local funds and,
except for the minimum salary requirement, is a matter of contract with the districts. 
Weslaco Fed'n of Teachers v. Tex. Educ. Agency, 27 S.W.3d 258, 261 n.2 (Tex.
App.-Austin 2000, no pet.). Thus, whether teachers are paid for training occurring outside
of regular work hours is a matter for the school districts, and any harm caused by a
district's failure to pay for additional training is the result of a school district's independent
decision. See, e.g., Raines v. Byrd, 521 U.S. 811, 830 n.11 (1997) (holding that injury was
not fairly traceable to defendant's actions, but rather, actions of independent third parties). We pause to note that it is also undisputed that teachers are often required to attend
additional training to ensure that they are providing the most advanced education for
students. We hesitate to issue an opinion that would undermine the Commissioner's ability
to ensure that the students in the State of Texas receive the best education possible by
requiring training for teachers. Wright, 468 U.S. at 760. Were we to conclude that TSTA
has standing in this case, it would "pave the way generally for suits challenging, not
specifically identifiable Government violations of the law, but the particular programs
agencies establish to carry out their legal obligations." Id. at 759. The allegedly deficient
salary was not caused by the Directives, and therefore, the trial court lacked jurisdiction over
this claim.


C. Devalued Teachers' Certificates and Stigma

 Finally, TSTA claimed below that teachers' certificates will be devalued and that
teachers will be "stigmatized." TSTA argued below that the devaluation and stigma arise
from the teachers' inability to be the "final rater" of their students' papers. But that issue
was settled for the 2005-2006 year at the hearing on the temporary injunction, and the
Commissioner did not require review of ratings by non-certified raters for that year. 
Likewise, the requirement was not included in the 2006-2007 Directive. TSTA has not
briefed its alleged "devaluation" injury before this Court, yet it persists with its "stigma"
argument. Tex. R. App. P. 38.1(h).

 Assuming that the devaluation argument is properly before this Court, we
nevertheless believe that TSTA's claim is addressed to the wrong party. It is undisputed
that the Commissioner does not control teacher certification. In fact, TSTA's amended
pleading admits that the State Board of Educator Certification regulates certification. See
Tex. Educ. Code Ann. §§ 21.040-.041 (Vernon 2006). Whether a teacher receives or
maintains his or her ability to hold a teacher's certificate, therefore, is not in any way
affected by the Directives. Id. 

 Aside from the State Board of Educator Certification, it is not clear from whom the
alleged devaluation and stigma would emanate. There was no evidence presented at the
temporary injunction hearing demonstrating how or why the "stigma" would occur. There
was no evidence presented that the Commissioner publicized the results of the tests or
maintained a record of a teacher's failure to pass the test. If stigma emanates from other
teachers or the school districts, TSTA has again sued the wrong party. 


 With regard to "stigma," we further find that TSTA has not alleged a concrete and
particularized injury necessary to demonstrate standing. As stated above, to have standing,
a plaintiff must allege a distinct injury. Inman, 121 S.W.3d at 872. Reviewing the case law,
it appears that TSTA's alleged "stigma" injury may be relevant to a Due Process claim. See
Smith v. State, 18 S.W.3d 770, 771 (Tex. App.-San Antonio 2000, pet. ref'd). However, to
demonstrate a particular injury to support standing, a party must plead a cognizable interest
that is protected by the Due Process clause. See Concerned Cmty. Involved Dev., Inc. v.
City of Houston, 209 S.W.3d 666, 672-73 (Tex. App.-Houston [14th Dist.] 2006, pet.
denied).

 "Due process protections attach when 'a person's good name, reputation, honor, or
integrity is at stake because of what the government is doing to him." Smith, 18 S.W.3d at
771 (quoting Wisconsin v. Constantinaeu, 400 U.S. 433, 437 (1971)). However, courts
have held that an "injury to reputation alone is not sufficient to trigger an individual's right
to due process-rather, a previously recognized right or status must be 'distinctly altered or
extinguished' by the government's actions in order for the individual to assert his due
process rights." Id. (quoting Paul v. Davis, 424 U.S. 693, 710-12 (1976)).

 For example, in Paul v. Davis, the plaintiff brought suit against two local police chiefs
after they circulated a flier to local businesses notifying them that the plaintiff was a potential
shoplifter, which was based on plaintiff's prior arrest for shoplifting. Paul, 424 U.S. at 695-96. At the time the flier was issued, the plaintiff had only been arrested and arraigned, but
he had not been convicted. Id. The flier was brought to the attention of plaintiff's employer,
who did not take adverse employment action against the plaintiff. Id. at 696. The plaintiff
brought a section 1983 action against the police chiefs, alleging that they violated his due
process rights, and also sought declaratory and injunctive relief. Id. 

 The Court held that the alleged "stigma" caused by the government's actions did not
implicate an interest protected by the Due Process clause. Id. at 701. " While we have in
a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which
may result from defamation by the government in a variety of contexts, this line of cases
does not establish the proposition that reputation alone, apart from some more tangible
interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the
procedural protection of the Due Process Clause." Id. Unless the stigma is coupled with
the loss of some other tangible right, such as loss of employment, there can be no Due
Process claim. Id. at 705.

 Although Paul v. Davis was not a subject-matter jurisdiction case, it is nevertheless
relevant to this Court's standing inquiry. TSTA has not indicated exactly how teachers'
certificates would be devalued, except to argue that under the 2005-2006 Directive prior to
the settlement, non-certified raters would not give the final grade on their students' papers. 
Both Ramos and Ayala, the Commissioner's representative, testified that even under that
Directive, the teachers were still entitled to grade their LEP students' test papers. Thus,
nothing has changed for these teachers. TSTA has not pleaded any loss of a tangible
employment right, caused by the Commissioner's directives, that would support "stigma" as
a Due Process injury. Concerned Cmty. Involved Dev., Inc., 209 S.W.3d at 672-73 (holding
that absent a showing of a cognizable property interest, plaintiff failed to show any
particularized Due Process injury to support standing). 

V. Ripeness

 In the alternative, (5) we also find that TSTA's allegations that a teacher may be subject
to sanctions and that a teacher's certificate may be devalued, resulting in stigma, are
entirely speculative and thus not ripe for review. Ripeness asks "whether the facts have
developed sufficiently so that an injury has occurred or is likely to occur, rather than being
contingent or remote." Patterson, 971 S.W.2d at 442. A case is not ripe if it involves
"uncertain or contingent future events that may not occur as anticipated, or indeed may not
occur at all." Id. In a declaratory judgment action, a plaintiff need not show that the injury
has already occurred. Rather, it must show the "ripening seeds of a controversy," which is
merely another way of saying that the injury is imminent or sufficiently likely to occur. City
of Waco v. Tex. Natural Res. Comm'n, 83 S.W.3d 169, 175 (Tex. App.-Austin 2002, pet.
denied). Ripening seeds of a controversy appear "where the claims of several parties are
present and indicative of threatened litigation in the immediate future which seems
unavoidable, even though the differences between the parties have not reached the state
of an actual controversy." Ainsworth v. Oil City Brass Works, 271 S.W.2d 754, 761 (Tex.
Civ. App.-Beaumont 1954, no writ).

 The ripeness doctrine is more than just a constitutional prohibition-it has a
pragmatic, prudential aspect as well. Patterson, 971 S.W.2d at 443. The doctrine
conserves judicial resources for real and current controversies and allows the proper
development of the state's jurisprudence. Id. "Moreover, avoiding premature litigation
prevents courts from 'entangling themselves in abstract disagreements over administrative
policies' while at the same time serving to 'protect the agencies from judicial interference
until an administrative decision has been formalized and its effects felt in a concrete way
by the challenging parties.'" Id. (quoting City of El Paso v. Madero Dev. & Constr. Co., 803
S.W.2d 396, 398-99 (Tex. App.-El Paso 1991, writ denied)). (6) The prudential aspect of
ripeness requires courts to consider "both the fitness of the issues for judicial decision and
the hardship to the parties of withholding court consideration." Perry v. Del Rio, 66 S.W.3d
239, 250 (Tex. 2001).

 In Waco Independent School District v. Gibson, the Texas Supreme Court applied
the ripeness doctrine to facts very similar to the case at bar. Waco Indep. Sch. Dist., 22
S.W.3d at 850. There, the Waco Independent School District ("WISD") adopted a student-promotion policy requiring a satisfactory grade on standardized assessment tests before
being promoted to the next grade level. Id. The policy included several remediation steps:
first, students who did not initially pass the test were required to attend a thirty-day summer
program. Id.  At the end of the program, the students would take a second test. Id. If they
passed, the students would be promoted to the next grade. Id.  If the students failed the
second test, they could take yet another test. Id.  Students were retained in their current
grade level only if they failed the third test. Id. 

 The Gibsons sued for injunctive relief to prevent WISD from implementing the plan. 
Id. They alleged that the policy would unfairly burden minorities because it identified and
stigmatized those students as failures. Id. Additionally, they alleged that the policy violated
the Equal Rights and Due Course of Law provisions of the Texas Constitution and was
adopted in violation of the Open Meetings Act, among other things. Id. WISD alleged that
the case was not ripe for adjudication because when the Gibsons sued, WISD had not
released the results of the assessment tests and therefore had not retained any students. 
Id. The trial court granted WISD's motion on all claims except their Open Meetings Act
claim. Id. at 851. 

 The supreme court held that the Gibsons' claims were not ripe. Id. Specifically, it
held that the alleged harm, retention, was only hypothetical:

 When this lawsuit was filed, no student in the WISD had been retained or
given notice of retention under the challenged policy because the
[standardized] test results were not yet available. The only notices that WISD
sent out were notices of possible retention if the students did not meet all
requirements for promotion. Thus, at the time this suit was filed, the alleged
harm to the students caused by retention was still contingent on uncertain
future events, i.e., the students' performance on the standardized tests and,
if necessary, in WISD's remediation program. Moreover, the impact the
Gibsons presumed was only hypothetical when the suit was filed; it may not
occur as anticipated, or may not occur at all. There simply is no allegation
that the Gibsons have suffered a concrete injury.


Id. at 852.

 

 The court recognized that a party can bring suit if an injury has not yet occurred if a
concrete injury is "likely to occur." Id. The court, however, held that to show that injuries
are likely, the threat of injury must be "direct and immediate" rather than "conjectural,
hypothetical, or remote." Id. In other words, parties must demonstrate that although harm
has not yet impacted them, it is imminent. Id. 

 The court held that the potential harm, retention of students in the same grade level,
remained contingent on the standardized test results and subsequent remediation. Id. 
These intervening events led the court to conclude that the harm was contingent and
remote rather than immediate. Id. The court also noted that the Gibsons were not
irrevocably harmed by the dismissal-because the case would be dismissed without
prejudice, they could re-file and develop a record when the claims ripened. Id. at 853.

A. Possible Sanctions by School Districts

 Similar to the claims in Gibson, we believe that TSTA's claims are not sufficiently
ripe to confer subject-matter jurisdiction. Id. The Directives do not impose any sanction. 
Likewise, there is no allegation that any school district has imposed sanctions on a teacher
who failed to become rater certified. Indeed, both teachers that testified at the temporary
injunction hearing conceded that no adverse employment action had been threatened or
taken. If this case were likened to a banana, it would be greener than Gibson and even
more unfit for judicial consumption. In Gibson, the students were at least aware that if they
failed the standardized tests and subsequent remediation, they would be retained. Id. 
Here, the teachers cannot say what sanction would be imposed or point to a threat of
sanction by the districts. 

 TSTA argued at the temporary injunction hearing that a teacher may not be able to
comply with a contract requiring TOP certification, and therefore, the school districts could
terminate the teachers for failure to comply with their contracts. Yet there is not a contract
in the record that requires TOP rater certification as a condition of employment. Kennedy
admitted that her contract did not specifically require TOP rater certification, and Ramos
testified that the school district was not requiring TOP rater certification as part of her
employment. 

 Kevin O'Hanlon, TSTA's own education law expert, testified at the temporary
injunction hearing that he was familiar with the different employment contracts used by
school districts throughout the state. He stated that he was not aware of any contract that
specifically required a teacher to be a TOP rater. O'Hanlon pointed to one standard
contract provision that requires teachers to provide the district with evidence of their
credentials. The provision did not, however, mention TOP rater certification. With regard
to this provision, he testified, "It's at least conceivable that a district could seek non-renewal
[of a teacher's contract] based solely upon a teacher not becoming a certified rater." But
conceivability is not enough. 

 TSTA's allegation that the teachers may be subject to sanctions for failure to comply
with their contracts is purely speculation based on events that may or may not ever come
to pass. School districts may not ever specifically include TOP rater certification in their
contracts of employment or interpret the existing language as requiring TOP certification. 
Id. 



 Finally, although TSTA argues that a school district might terminate a contract
because a teacher failed to become TOP rater certified, school districts must follow specific
procedures before termination. In fact, TSTA itself introduced expert testimony from
O'Hanlon at the temporary injunction hearing regarding the procedures that must be
followed. According to our own reading of the education code, a school district may elect
to nonrenew a term contract pursuant to its employment policies, and it must give at least
45 days notice prior to the last day of instruction in a school year that it intends not to renew
the contract. Tex. Educ. Code Ann. § § 21.203(b); 21.206(a). In other words, before a
school district can rely on a teacher's failure to become a certified rater as a ground for
nonrenewal, the school district must adopt a policy stating as much and still have at least
45 days before the last day of instruction in a school year to give notice. Tex. Educ. Code
Ann. § § 21.203(b); 21.206(a). There is nothing in the record to demonstrate that any
school district has begun this process. The possibility that a school district may impose
sanctions for a teachers' failure to become TOP rater certified is contingent on too many
variables that may or may not come to pass to be ripe for adjudication. 

B. Devalued Teachers' Certificates and Stigma

 The theory that a teacher's certificate may be devalued and that they may be
stigmatized is subject to the same infirmities. Whether the State Board for Educator
Certification will include TOP rater certification as an additional requirement for teaching
LEP students is purely speculative-there is no pleading or evidence to indicate such an
action is imminent. Moreover, there is no pleading or evidence that any school district has
used TOP rater certification as a measuring chart for determining general performance of
teachers or has threatened or imposed any other sanctions. Finally, there is no evidence
that teachers have been black-listed or that their standing in the community has been
affected by failing the test. These claims are merely speculative and are not ripe for review. 
Gibson, 22 S.W.3d at 851-53.

 We also note that a dismissal on ripeness grounds will not irreparably harm the 
TSTA. Assuming that it can cure the standing defects noted above, and its claims mature
sufficiently, it could bring its claims against the proper party at a later date once an actual
injury has occurred. Gibson, 22 S.W.3d at 853.

VI. Conclusion

 For all the foregoing reasons, we hold that TSTA does not have standing to assert
its claims against the Commissioner. Additionally, we find that its claims are not ripe for
adjudication. Accordingly, we vacate the trial court's order denying the Commissioner's plea
to the jurisdiction and dismiss the case for want of jurisdiction.


 ___________________________ 

 GINA M. BENAVIDES,

 Justice


Concurring Memorandum Opinion

by Justice Rose Vela.


Memorandum Opinion delivered and

filed this the 16th day of August, 2007.


1. The Commissioner also argued that the teachers had multiple, adequate administrative remedies
under the Texas Education Code, including review by the Commissioner, if a sanction was imposed by the
school districts. In response, TSTA asserts that this argument invokes the merits of their Due Process claim. 
 The Commissioner also argued that declaratory judgment was improper because TSTA failed to join
necessary parties. Because of our disposition of the case, we need not address these arguments. Tex. R.
App. P. 47.1.
2. In the interim, the Commissioner formally adopted a rule that allows her to "require evidence of
successful completion of training activities." 19 Tex. Admin. Code § 101.3005 (adopted effective July 20,
2006). We need not address what affect the adoption of this rule has on the instant case because we
determine the case is not justiciable. Tex. R. App. P. 47.1.
3. The case was transferred to the Thirteenth Court of Appeals pursuant to a docket equalization order
issued by the Supreme Court of Texas. Tex. Gov't Code Ann. § 73.001 (Vernon 1998).
4. Standing to sue can be predicated on common-law or statutory authority, which may provide differing
standards. DaimlerChrysler Corp. v. Inman, 121 S.W.3d 862, 869 (Tex. App.-Corpus Christi 2003, pet.
granted). Common-law rules apply except where a statute specifically alters the common-law rules. Id. 
TSTA alleged jurisdiction pursuant to the Administrative Procedure Act, Tex. Gov't Code § 2001.038 (Vernon
2000), the Uniform Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.003 ( Vernon 1997),
a provision of the Civil Practice and Remedies Code governing injunctive relief, Tex. Civ. Prac. & Rem. Code
Ann. § 65.021 (Vernon 1997). None of these statutes, however, supplant or relax the constitutional minimum
required for standing to sue. Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001) (applying general common law
test to declaratory judgment and injunction action); Tex. Assoc. of Bus. v. Tex. Air Control Bd., 852 S.W.2d
440, 444 (Tex. 1993) ("[W]e have interpreted the Uniform Declaratory Judgments Act . . . to be merely a
procedural device for deciding cases already within a court's jurisdiction rather than a legislative enactment
of a court's power, permitting the rendition of advisory opinions."); Garcia-Marroquin v. Nueces County Bail
Bond Bd., 1 S.W.3d 366, 378 (Tex. App.-Corpus Christi 1999, no pet.) ("The boundary of a court's
jurisdictional limits to render declaratory judgments is the rule prohibiting a court from rendering an advisory
opinion.");Beacon Nat'l Ins. Co. v. Montemayor, 86 S.W.3d 260, 268 (Tex. App.-Austin 2002, no pet.) (holding
that under Administrative Procedure Act, plaintiff must demonstrate a basis for a declaratory judgment).
5. Citing Texas Association of Business v. Texas Air Control Board, 852 S.W.2d 440 (Tex. 1990),
Justice Vela argues that our discussion of ripeness constitutes an advisory opinion, which we have no
jurisdiction to issue. Justice Vela, however, confuses a decision on the merits with a decision regarding our
ability to proceed to the merits. An advisory opinion is a ruling on an abstract question of law in a case where
the court lacks jurisdiction. Id. at 444. The prohibition on advisory opinions precludes a ruling on the merits
of a claim. See id. Our ripeness determination does not address the merits of TSTA's claim-rather, it
addresses an alternative argument against jurisdiction raised by the Commissioner. See Gibson, 22 S.W.3d
at 850 ("[S]tanding and ripeness are components of subject matter jurisdiction.") (emphasis added). A court
always has jurisdiction to determine whether it has jurisdiction, which differs from its authority to decide a case
on the merits. Dolenz v. Vail, 200 S.W.3d 338, 341 (Tex. App.-Dallas 2006, no pet.); Perry v. Del Rio, 53
S.W.3d 818, 824 (Tex. App.-Austin 2001), pet. dism'd, 66 S.W.3d 239 (Tex. 2001); In re Washington, 7
S.W.3d 181, 182 (Tex. App.-Houston [1st Dist.] 1999, orig proceeding); see also Nacogdoches County Hosp.
v. Newman, No. 12-06-00375, 2007 Tex. App. LEXIS 3948, at *10-13 (Tex. App.-Tyler May 23, 2007, no pet.)
(deciding that plaintiff both lacked standing and that claims were not ripe). We anticipate that TSTA will
appeal this decision to the Supreme Court, and we have decided the ripeness issue so that the Supreme
Court will have the benefit of our analysis. See Quigley v. Bennett, No. 05-0870, 2007 Tex. LEXIS 526, at *10-11 (Tex. June 8, 2007) (remanding for consideration of issues not previously addressed by court of appeals);
Farmer's Group, Inc. v. Lubin, 222 S.W.3d 417, 427-28 (Tex. 2007) (same). 
6. The ripeness inquiry is no different in cases brought under the Administrative Procedure Act, section
2001.038 of the Texas Government Code, or under the Declaratory Judgments Act. Tex. Mut. Ins. Co. v. Tex.
Dep't of Ins., 214 S.W.3d 613, 622 (Tex. App.-Austin 2006, no pet.); Atmos Energy Corp. v. Abbott, 127
S.W.3d 852, 856-57 (Tex. App.-Austin 2004, no pet.).